662 F.2d 975
 26 Fair Empl.Prac.Cas. 1569,
27 Empl. Prac. Dec. P 32,160
 Mamie CROKER, Eric P. Travis, Chivis Davis, Sr., Robert W.
DeBose, and Leolin Dockins, Jr., individually and
on behalf of all others similarly situated
v.
The BOEING CO. (VERTOL DIVISION) and Local No. 1069 of
International Union; United Automobile, Aerospace
and Agricultural Implement Workers of
America (UAW).
Appeal of Mamie CROKER, Eric Travis, Chivis Davis, Leolin
Dockins, and Robert DeBose, on their own behalf
and on behalf of the class of persons
they represent, in No. 80-1569.
Appeal of The BOEING CO. (VERTOL DIVISION) in No. 80-1570.
 
 Nos. 80-1569, 80-1570.
 United States Court of Appeals,
Third Circuit.
 Argued Dec. 2, 1980.
Reargued In Banc May 12, 1981.
Decided Sept. 30, 1981.
 Jeffrey A. Less, John F. Smith, III (argued), Hope A. Comisky, Dilworth, Paxson, Kalish & Levy, Philadelphia, Pa., for appellants Mamie Croker, et al.
 Robert M. Landis (argued), Jerome A. Hoffman, Marie M. Gursky, Bruce A. Cohen, Dechert, Price & Rhoads, Philadelphia, Pa., for appellant The Boeing Co. (Vertol Div.).
 Before SEITZ, Chief Judge, and ALDISERT, ADAMS, GIBBONS, HUNTER, WEIS, GARTH, HIGGINBOTHAM and SLOVITER, Circuit Judges.
 OPINION OF THE COURT
 SEITZ, Chief Judge.
 
 
 1
 This is an appeal from several orders of the district court entered in a class action suit brought by five employees of the Vertol Division of the Boeing Company (Boeing Vertol). The plaintiffs (the individual and class plaintiffs are hereinafter referred to as "the employees") alleged racial discrimination in employment, in violation of title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and of the Civil Rights Act of 1866 and 1871, 42 U.S.C. §§ 1981, 1985. The employees assert that this court has jurisdiction under 28 U.S.C. § 1291 (1976). Boeing Vertol has moved to dismiss portions of the appeal for lack of subject matter jurisdiction.
 
 I. PROCEDURAL HISTORY
 
 2
 Boeing Vertol is a major government contractor located in Ridley Township, Delaware County, Pennsylvania. It is engaged in the manufacture of helicopters, and nearly all of its production is purchased by the United States Department of Defense. Five Boeing Vertol employees, Mamie Croker, Eric Travis, Leolin Dockins, Chivis Davis, and Robert DeBose, brought an action individually and on behalf of a class of black employees of and applicants for employment at Boeing Vertol. They alleged that Boeing Vertol and Local 1069 (the Union) had discriminated on the basis of race in all phases of employment. Under rule 23(b)(2) of the Federal Rules of Civil Procedure, the district court certified a class action. The class was later modified to consist of:
 
 
 3
 Under Title VII, all Negro persons who had applications pending for employment with Boeing Vertol on or after March 23, 1968, or who have been employed by Boeing Vertol at any time between March 23, 1968 and June 30, 1975, the date on which trial of this action commenced;
 
 
 4
 Under 42 U.S.C. §§ 1981, 1985, all Negro persons who had applications pending for employment with Boeing Vertol on or after September 2, 1965, or who had been employed by Boeing Vertol at any time between September 2, 1965 and June 30, 1975, the date on which trial of this action commenced.
 
 
 5
 Croker v. Boeing Co. (Vertol Division), 437 F.Supp. 1138, 1198 (E.D.Pa.1977).
 
 
 6
 The district court bifurcated the case, and a nonjury trial on the liability issues began in 1975. Shortly after trial began, the Union and the employees reached a settlement. The employees and Boeing Vertol proceeded to trial, presenting both extensive statistical evidence and supporting individual testimony.
 
 
 7
 In June 1977, the district court found in favor of Boeing Vertol and against the class and certain individual employees on all issues of liability, but in favor of Croker, Dockins, Davis, Travis, and two class member witnesses, Donald Ferrel and Horace Dixon, on portions of their claims of racial discrimination in employment.[1] See id. Specifically, the court found that Croker, Dockins, Davis, and Ferrell were discriminatorily denied promotions, that Dixon was discriminatorily denied a request for transfer, that Croker and Travis were subject to discriminatory harassment, and that Travis was also subject to discriminatory discipline and retaliation.
 
 
 8
 Trial on the issue of damages for the six employees was held in November 1977. In that same month, the district court, while reserving the issue as to the amount, awarded attorney's fees and costs to then-prevailing plaintiffs Croker, Travis, Davis, and Dockins, and awarded costs to Boeing Vertol against the class and DeBose. See Croker v. Boeing Co. (Vertol Division), 444 F.Supp. 890 (E.D.Pa.1977). In October 1979, the district court issued an opinion and order on the damages portion of the action. See Croker v. Boeing Co., 23 FEP Cases 1783 (E.D.Pa. Oct. 12, 1979). The court held, relying on an opinion handed down by this court after the liability phase of trial had been completed, see Dickerson v. United States Steel Corp., 582 F.2d 827 (3d Cir. 1978), that Ferrell and Dixon were not entitled to individual relief because they were not named plaintiffs, but were class-member witnesses whose class-wide claims had been unsuccessful. See id. at 834. The court also found that Dockins was not entitled to damages because the discriminatory acts on which liability to him was predicated occurred in a period barred by the applicable statute of limitations. Croker, Travis, and Davis were awarded damages: Croker and Travis were awarded $15,050 and $3,550 respectively for section 1981 and title VII violations; Davis was awarded title VII backpay in the amount of $891.13 plus interest.
 
 
 9
 In March 1980, the district court fixed the amount of attorney's fees to be awarded to Croker, Travis, and Davis, whose right to fees had been previously determined. The employees then filed this appeal from the June 1977, November 1977, October 1979, and March 1980 orders.
 
 
 10
 On appeal, the employees contend that the district court erred in (1) requiring the employees to prove purposeful discrimination under 42 U.S.C. § 1981; (2) ruling that title VII liability commenced in March 1968 rather than July 1965; (3) applying an incorrect standard of proof to the employees' title VII claims; (4) failing to find Boeing Vertol liable for discrimination against the class of black employees in (a) initial placement, (b) promotions to supervisory and leadman positions, and (c) discipline and harassment; (5) failing to find Boeing Vertol liable for discrimination against certain individual black employees in promotions to supervisory and leadman positions; and (6) holding that Boeing Vertol was entitled to costs against the class of black employees and individual plaintiff DeBose. Boeing Vertol filed a cross appeal, but in its brief it presented no issues for review on its cross appeal. Instead, it responded only to those issues raised by the employees. Boeing Vertol has also moved to dismiss the employees' appeal as to the 1977 and 1979 orders on the ground that the employees did not file a timely notice of appeal from those orders.
 
 II. APPELLATE JURISDICTION
 
 11
 We must first address Boeing Vertol's motion to dismiss portions of this appeal for lack of subject matter jurisdiction.[2] Boeing Vertol contends that the employees' notice of appeal was timely only as to the March 1980 order, and it therefore seeks dismissal of all portions of the appeal not concerning that order.
 
 
 12
 In the October 1979 order, the district court entered judgment against Boeing Vertol in favor of Croker, Travis, and Davis and in favor of Boeing Vertol against Dockins, Dixon, and Ferrell. Because the district court had determined entitlement to attorney's fees in its November 1977 order, the only issue that was unresolved after entry of the October 1979 order was the amount of such fees to be awarded. In its March 12, 1980 order, the district court set the amount of attorney's fees. Thereafter, on April 8, 1980, the employees filed their notice of appeal from all four orders (June 1977, November 1977, October 1979, March 1980).
 
 
 13
 Boeing Vertol contends that the employees were required to appeal the 1977 and 1979 orders within thirty days of the October 1979 order, which Boeing Vertol contends was the final judgment as to the matter to be decided. See 28 U.S.C. § 1291; Fed.R.App.P. 4(a) (appeal shall be filed within 30 days from entry of judgment). The employees respond that the judgment was not final until the amount of attorney's fees was set, and that their notice of appeal, filed within thirty days of the March 1980 order, was therefore timely as to all the orders.
 
 
 14
 Thus, the issue raised by Boeing Vertol's motion to dismiss is whether an order is final for purposes of appeal when a district court has decided all issues in a case, including entitlement to civil rights attorney's fees, except the amount of attorney's fees. An answer to this question is important because our prior panel opinions provide conflicting guidance. Compare, e. g., Paeco, Inc. v. Applied Moldings, Inc., 562 F.2d 870, 879 (3d Cir. 1977) (in patent case, order nonfinal that does not decide liability and damages for antitrust violations and amount of attorney's fees), and Richerson v. Jones, 551 F.2d 918, 922 (3d Cir. 1977) (in employment discrimination case, order nonfinal that left unresolved issue of attorney's fees), with DeLong Corp. v. Raymond International, Inc., 622 F.2d 1135, 1138-39 n.3 (3d Cir. 1980) (in patent case, order disposing of merits final if it has determined entitlement to, but not amount of, attorney's fees), and Baughman v. Cooper-Jarrett, Inc., 530 F.2d 529, 531 n.2 (3d Cir.) (reservation of determination of amount of mandatory attorney's fees recoverable under 15 U.S.C. § 15 does not affect finality of judgment), cert. denied, 429 U.S. 825, 97 S.Ct. 78, 50 L.Ed.2d 87 (1976).
 
 A.
 
 15
 Boeing Vertol suggests that the setting of attorney's fees is the equivalent of the taxing of costs under rule 58 of the Federal Rules of Civil Procedure. Because rule 58 provides that "(e)ntry of the judgment shall not be delayed for the taxing of costs," Boeing Vertol contends that the October 1979 order was a final judgment.
 
 
 16
 We recognize that both the Civil Rights Attorney's Fees Award Act of 1976, 42 U.S.C. § 1988, and title VII, id. § 2000e-5(k), in granting the right to seek attorney's fees, direct that "the court, in its discretion, may allow the prevailing party ... a reasonable attorney's fee as part of the costs." 42 U.S.C. § 1988; id. § 2000e-5(k).[3]
 
 
 17
 Some circuits have concluded from the statutory language that "Congress directed that attorney's fees under section 1988 be treated as costs" within the meaning of the Federal Rules of Civil Procedure. See Knighton v. Watkins, 616 F.2d 795, 797 (5th Cir. 1980) (motion for attorney's fees unlike motion to alter or amend judgment and thus need not be filed within ten days of entry of judgment under rule 59(e)); accord, Johnson v. Snyder, 639 F.2d 316, 317 (6th Cir. 1981) (per curiam); Bond v. Stanton, 630 F.2d 1231, 1234 (7th Cir. 1980). Other circuits, however, have concluded that when Congress referred to attorney's fees as "costs," it did not mean "to include those fees within the specific type of costs recoverable after judgment under (the Federal Rules)." See White v. New Hampshire Department of Employment Security, 629 F.2d 697, 702 (1st Cir. 1980), cert. granted, --- U.S. ----, 101 S.Ct. 2313, 68 L.Ed.2d 839 (1981); accord, Obin v. District No. 9, International Association of Machinists, at 580 (8th Cir. 1981) ("differences between attorney's fees and the items routinely assessed as costs after entry of judgment on the merits make it unlikely that Congress intended that fees be treated as costs for purposes of Rule 54(d)"); Gurule v. Wilson, 635 F.2d 782, 787 (10th Cir. 1980). These courts have also recognized that the Supreme Court's identification of section 1988 fees as "costs" in Hutto v. Finney, 437 U.S. 678, 695, 98 S.Ct. 2565, 2576, 57 L.Ed.2d 522 (1978), which was made in the course of evaluating an eleventh amendment bar to award of such fees against the states, "hardly seems dispositive of the question whether section 1988 attorney's fees fall within the specific types of taxable costs contemplated by Fed.R.Civ.P. 54(d) and 58." See White, 639 F.2d at 703; accord, Obin, at 580.
 
 
 18
 We agree that the denomination of attorney's fees as "costs" in the relevant attorney's fees statutes was not intended to equate the often time-consuming process of setting fees with the routine award of other costs contemplated by the Federal Rules of Civil Procedure. Under the Federal Rules, costs are allowed as a matter of course to the prevailing party and are routinely taxed by the clerk of the court. See Fed.R.Civ.P. 54. The kind of attorney's fees involved in this case, on the other hand, are awarded in the discretion of the district court and involve numerous considerations. As the United States Court of Appeals for the First Circuit has said:
 
 
 19
 Appeals often ensue-leading to the prospect of separate fees appeals if final judgment rules are disregarded-as the sizeable sums involved may impose a very substantial and bitterly disputed liability upon the losing party. Hence while such fees, like routine costs, are, to be sure, somewhat ancillary to the main dispute, they are fully capable of engendering a major controverted claim which will require careful factual and legal analysis by the court. The considerations making it feasible to treat routine costs as an exception to final judgment rules-the ease of their computation and the fact that they almost never give rise to dispute or appeal-plainly do not apply to section 1988 attorney's fees.
 
 
 20
 White, 629 F.2d at 702-03 (emphasis added). We concur that costs and fees cannot necessarily be equated for purposes of determining whether a judgment is a final order.
 
 B.
 
 21
 Boeing Vertol also contends that once the question of entitlement to attorney's fees was determined, the exact amount of attorney's fees was a collateral issue that did not affect the finality of the district court's October 1979 order. We recognize that DeLong and Baughman suggest such a rule, see DeLong, 622 F.2d at 1138-39 n.3; Baughman, 530 F.2d at 531 n.2, but we decline to adopt Boeing Vertol's position.
 
 
 22
 A final order "terminates the litigation between the parties on the merits of the case and leaves nothing to be done but to enforce by execution what has been determined." St. Louis Iron Mountain & Southern Railway v. South Express Co., 108 U.S. 24, 28-29, 2 S.Ct. 6, 27 L.Ed. 638 (1883). Boeing Vertol contends that the litigation on the merits between it and the employees was effectively terminated as of the October 1979 order. We believe, however, that a judgment in a case such as this may not be considered final for purposes of appeal until a district court has determined the extent of liability for any attorney's fees to be awarded. In Richerson v. Jones, also an employment discrimination case, we rejected the contention that the award of attorney's fees is collateral to the merits of a litigation. See Richerson, 551 F.2d at 921-22. But see, e. g., Obin, at 582 ("motion for attorney's fees raises a collateral and independent claim, not an application for costs under Rule 54(d) or a matter integral to the merits of the action"). We noted in Richerson that in Liberty Mutual Insurance Co. v. Wetzel, 424 U.S. 737, 96 S.Ct. 1202, 47 L.Ed.2d 435 (1976), the Supreme Court found an order nonappealable when it failed to dispose of certain of the plaintiffs' requests for relief, including injunctive relief, damages, and attorney's fees. See id. at 742, 96 S.Ct. at 1205. We therefore held in Richerson that an order leaving "the issue of attorney's fees unresolved, did not terminate the litigation between (the parties) and thus, was not a final order." See Richerson, 551 F.2d at 922.
 
 
 23
 We believe that the Richerson rule applies not only when the question of liability for attorney's fees is unresolved but also when the possible extent of such liability remains undetermined. See, e. g., Williams v. Ezell, 531 F.2d 1261, 1263 (5th Cir. 1976). But see, e.g., Memphis Sheraton Corp. v. Kirkley, 614 F.2d 131, 133 (6th Cir. 1980). This holding is not inconsistent with Boeing Co. v. Van Gemert, 444 U.S. 472, 100 S.Ct. 745, 62 L.Ed.2d 676 (1980). In that case, the Supreme Court found that a judgment awarding a fixed recovery was final and appealable even though the district court had not fixed the amount of attorney's fees to be assessed. The district court had, however, established the extent of liability to the class; attorney's fees were to be awarded from the unclaimed portion of a fixed judgment fund. Therefore, the district court's "judgment terminated the litigation between Boeing and the class concerning the extent of Boeing's liability." Id. at 479-81 n.5, 100 S.Ct. 751. In this case, on the other hand, although the court had determined as of the October 1979 order that Boeing Vertol would be liable for attorney's fees, the extent of that liability remained unresolved.
 
 C.
 
 24
 Until the amount of attorney's fees is set, or a fund from which they are to be awarded is established, litigation over the extent of parties' liabilities has not been terminated. In a case such as this, "(t)he ultimate award of fees is, in our view, clearly a part of the overall relief sought and granted." See White at 704. To the extent that DeLong or Baughman are inconsistent with this decision, they are overruled. See United States Court of Appeals for the Third Circuit, Internal Operating Procedures, VIIIC.
 
 
 25
 Because the employees filed their notice of appeal within thirty days of entry of the final order-the order setting attorney's fees-Boeing Vertol's motion to dismiss portions of this appeal for lack of subject matter jurisdiction is denied.
 
 III. SECTION 1981 CLAIMS
 
 26
 The district court held that "to make out a claim under § 1981, the plaintiffs must prove a racially discriminatory purpose." 437 F.Supp. at 1181. The court reached this conclusion by determining that the requirement of proof of discriminatory purpose to establish a claim under the fourteenth amendment to the Constitution, see Washington v. Davis, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), applies equally well to claims brought under section 1981. The district court noted that the language of section 1981 "clearly is parallel to the equal protection clause of the Fourteenth Amendment." It also stated that proof of intent is required to give meaning to Washington v. Davis, "since § 1981 is applicable in every case in which constitutional claims of employment discrimination are asserted." 437 F.Supp. at 1181. Because it found that "the racial disparities established by the plaintiffs, at least those since 1965, are insufficiently dramatic or unexplainable to justify an inference of purposeful discrimination," the court dismissed the employees' section 1981 class claims against Boeing Vertol. Id. at 1182. The district court, however, found that Croker and Travis had proved their individual claims of section 1981 violations.
 
 
 27
 The employees contend on appeal that proof of intent is not a necessary element of a claim brought under section 1981. They argue that a section 1981 violation may be shown by proof that would be sufficient to establish a violation under title VII-that is, by a showing of either disparate treatment or disparate impact.
 
 A.
 
 28
 The cases construing section 1981 provide no definitive answer to this issue. Prior to the Supreme Court's decision in Washington v. Davis, many circuit courts did not require proof of discriminatory purpose for claims brought under section 1981. See, e. g., Douglas v. Hampton, 512 F.2d 976, 981 (D.C. Cir. 1975); Castro v. Beecher, 459 F.2d 725, 732-33 (1st Cir. 1972). While this circuit had not directly addressed the issue, our cases might reasonably have been read not to require a showing of intent. See Educational Equality League v. Tate, 472 F.2d 612, 618 (3d Cir. 1972) (§ 1983); Erie Human Relations Commission v. Tullio, 493 F.2d 371, 373 n.4 (3d Cir. 1974) (prima facie case requires demonstration of underrepresentation of blacks and opportunity for racial discrimination). In Washington v. Davis, however, the Supreme Court held that a claim brought under the fourteenth amendment to the Constitution requires proof of purposeful discrimination. See 426 U.S. at 239, 96 S.Ct. at 2047.
 
 
 29
 Washington v. Davis resulted in a reexamination by many courts of the standard of proof under section 1981. As the United States Court of Appeals for the Second Circuit explained: "Before Washington v. Davis, we had approached § 1981 with the belief that the Constitution itself prohibited conduct having a discriminatory impact as well as purposefully discriminatory conduct. Now that our constitutional premise has been declared erroneous, we must of course reconsider our statutory conclusion." Guardians Association v. Civil Service Commission, 633 F.2d 232, 264 (2d Cir. 1980), cert. denied, --- U.S. ----, 101 S.Ct. 3083, 69 L.Ed.2d 954 (U.S. June 16, 1981). Since Washington v. Davis, most of the appellate courts considering the standard of proof for a section 1981 claim have required a showing of intent. See Guardians Association, 633 F.2d at 264; Craig v. County of Los Angeles, 626 F.2d 659, 668 (9th Cir. 1980), cert. denied, 450 U.S. 919, 101 S.Ct. 1364, 67 L.Ed.2d 345 (1981); Mescall v. Burrus, 603 F.2d 1266, 1271 (7th Cir. 1979); Williams v. DeKalb County, 582 F.2d 2, 2-3 (5th Cir. 1978) (per curiam); Johnson v. Alexander, 572 F.2d 1219, 1222 (8th Cir.), cert. denied, 439 U.S. 986, 99 S.Ct. 579, 58 L.Ed.2d 658 (1978). But cf. Kinsey v. First Regional Securities, Inc., 557 F.2d 830, 838 n.22 (D.C. Cir. 1977) (since plaintiff proceeding under title VII and section 1981, need not prove discriminatory purpose).[4]
 
 
 30
 In Washington v. Davis the Supreme Court addressed only the standard of proof in a case brought under the fifth or fourteenth amendment, not the level of proof necessary under section 1981. See New York Transit Authority v. Beazer, 440 U.S. 568, 583-84 n.24, 99 S.Ct. 1355, 1364-65, 59 L.Ed.2d 587 (1979) (noting that "exact applicability of that provision has not been decided); cf. City of Memphis v. Greene, --- U.S. ----, 101 S.Ct. 1584, 1596, 67 L.Ed.2d 769 (1981) (not confronting "prematurely the rather general question whether either § 1982 or the Thirteenth Amendment requires proof of specific unlawful purpose"). Nevertheless, we believe that Washington v. Davis has some applicability to the issue of proof under section 1981. Furthermore, in light of the numerous courts of appeals decisions reassessing section 1981 after Washington v. Davis, we believe that we should reexamine the issue to determine whether proof of a section 1981 violation may be made on a showing of disproportionate impact or whether a showing of purposeful discrimination is essential.[5]B.
 
 
 31
 Section 1981 grants to all persons within the United States "the same right ... to make and enforce contracts ... as is enjoyed by white citizens...."[6] The language of the statute is inconclusive, but we believe that if it points in any direction, it suggests a requirement for proof of purposeful discrimination. See City of Memphis v. Greene, 101 S.Ct. at 1602 (White, J., concurring) (under similar language of section 1982, "(p)urposeful racial discrimination is quite clearly the focus of the proscription"); Guardians Association, 633 F.2d at 267. See generally Heiser, Intent v. Impact, The Standard of Proof Necessary to Establish a Prima Facie Case of Race Discrimination Under 42 U.S.C. § 1981, 16 San Diego L.Rev. 207, 233-37 (1979) (discussing language of section 1981 and other civil rights statutes and concluding that, while not unambiguous, section 1981's language supports argument that intent required). The guarantee of the "same right" to make contracts "as is enjoyed by white citizens" is similar to the guarantee of "equal protection" embodied in the fourteenth amendment, a standard that requires proof of intentional discrimination under Washington v. Davis. As long as both nonwhite and white employees are subject to the same employment requirements or restrictions, both may be said to have been granted the right to contract on equal terms. The Supreme Court stated in construing the constitutional guarantee of equal protection: "(W)e have difficulty understanding how a law establishing racially neutral qualifications for employment is nevertheless racially discriminatory and denies 'any person ... equal protection of the laws' simply because a greater proportion of Negroes fail to qualify than members of other racial or ethnic groups." Washington v. Davis, 426 U.S. at 245, 96 S.Ct. at 2050. We confront this same difficulty in construing section 1981's similar guarantee of the "same right ... to make and enforce contracts."
 
 
 32
 Furthermore, we believe that the language of section 1981 is far less susceptible of an interpretation permitting an impact standard than is the language of title VII. Under section 703(a)(2) of the 1964 Act, it is an unlawful employment practice to "limit, segregate, or classify ... employees or applicants for employment in any way which would deprive or tend to deprive" them of "employment opportunities or otherwise adversely affect their status as employees" because of their race or color. 42 U.S.C. § 2000e-2(a)(2). While that language is consistent with a conclusion that "Congress directed the thrust of the Act to the consequences of employment practices, not simply the motivation," see Griggs v. Duke Power Co., 401 U.S. 424, 432, 91 S.Ct. 849, 854, 28 L.Ed.2d 158 (1971) (emphasis in original), no such conclusion is apparent from the language of section 1981. See Heiser, supra, at 237-38.
 
 
 33
 We recognize that there is an argument that nonwhite citizens cannot be said to enjoy the same rights as white citizens under the statute if facially neutral practices have an adverse impact on them. See Heiser, supra, at 234 (concluding, however, that language of section 1981 suggests intent requirement). We think this is a tenuous reading of the statutory language calling for all citizens to have the "same right" to contract as whites. Nevertheless, this reading indicates that the language of the statute is not conclusive. Cf. Comment, Developments in the Law-Section 1981, 15 Harv.C.R.-C.L.L.Rev. 29, 48 (1980) (hereinafter cited as Comment, Section 1981 ) ("The statute is written in broad language subject to various interpretations."). We therefore look to congressional intent through the legislative history of section 1981.
 
 C.
 
 34
 Section 1981 was first enacted as part of section 1 of the Civil Rights Act of 1866, pursuant to section 2 of the thirteenth amendment to the Constitution.[7] The employees cite this history to support their contention that it is inappropriate to apply the intent requirement of the fourteenth amendment to a cause of action grounded in the thirteenth amendment. They assert that because the thirteenth amendment was enacted to eliminate the badges and incidents of slavery, see Civil Rights Cases, 109 U.S. 3, 20, 3 S.Ct. 18, 27, 27 L.Ed. 835 (1883), "motivation is irrelevant when one is concentrating on the destruction of the institution of slavery and its lingering manifestations in private employment practices."
 
 
 35
 The scope of the thirteenth amendment and section 1981 is not coextensive with the scope of the fourteenth amendment. Cf. City of Memphis v. Greene, 101 S.Ct. at 1596 (section 1982 and thirteenth amendment coverage significantly different from fourteenth amendment coverage). Nevertheless, section 1981 has some ties to the fourteenth amendment because it was reenacted in section 16 of the Civil Rights Act of 1870, after adoption of the fourteenth amendment, in part because of congressional concern about the constitutionality of the 1866 Act. See, e. g., Runyon v. McCrary, 427 U.S. 160, 168-69 n.8, 96 S.Ct. 2586, 2593, 49 L.Ed.2d 415 (1976) ("There is ... no basis for inferring that Congress did not understand the draft legislation which eventually became 42 U.S.C. § 1981 to be drawn from both § 16 of the 1870 Act and § 1 of the 1866 Act."); Mahone v. Waddle, 564 F.2d 1018, 1030 (3d Cir. 1977) (section 1981 rests on thirteenth and fourteenth amendments) cert. denied, 438 U.S. 904, 98 S.Ct. 3122, 57 L.Ed.2d 1147 (1978). Even if section 1981 is considered to rest solely on the thirteenth amendment powers of Congress, however, it does not follow that discriminatory impact is the touchstone of a section 1981 claim.
 
 
 36
 The thirteenth amendment prohibits slavery and involuntary servitude. From its first interpretation by the Supreme Court, the amendment has been construed to grant to Congress the "power to pass all laws necessary and proper for abolishing all badges and incidents of slavery." Civil Rights Cases, 109 U.S. at 20, 3 S.Ct. at 28. Much more recently, the Court has declared that "Congress has the power under the Thirteenth Amendment rationally to determine what are the badges and the incidents of slavery, and the authority to translate that determination into effective legislation." Jones v. Alfred H. Mayer Co., 392 U.S. 409, 440, 88 S.Ct. 2186, 2203, 20 L.Ed.2d 1189 (1968) (Congress has power under thirteenth amendment to prohibit private as well as public discrimination).
 
 
 37
 The Civil Rights Act of 1866 was enacted to give "real content to the freedom guaranteed by the Thirteenth Amendment." Id. at 433, 435, 88 S.Ct. at 2200-2201. Whether that content includes protection from facially neutral actions having a discriminatory impact is uncertain from the Act's legislative history. That history has been reviewed extensively in other cases,[8] and we will not repeat it here. We believe it is clear that the 1866 Act was a response to burgeoning abuses against former slaves, which threatened to render illusory the freedom granted to them in the thirteenth amendment. See, e. g., Comment, Section 1981, supra, at 38. This threat came from the growing power of the Klu Klux Klan and the adoption by the Southern States of the "Black Codes," which restricted such varied rights as the rights to serve as ministers, to receive an education, and to own arms. See id. at 40. While it is true that they also contained some facially neutral statutes, such as vagrancy laws, those statutes were intended to be and were purposefully applied in a discriminatory fashion. See, e. g., Note, Section 1981: Discriminatory Purpose or Disproportionate Impact?, 80 Colum.L.Rev. 137, 157-58 (1980) (hereinafter cited as Note, Purpose or Impact? ). Thus, the legislative history of the 1866 Act generally reveals congressional concern with "direct, intentional abuses." See City of Memphis v. Greene, 101 S.Ct. at 1604 (White, J., concurring) (section 1982 requires proof of purposeful discrimination); Note, Purpose or Impact?, supra, at 157 (noting that history not conclusive, but "(w)hat can be demonstrated is a strong congressional preoccupation with the varied types of intentional discrimination commonplace in the South at the time."). We think that it is more likely than not that the statute was addressed to such intentional conduct.
 
 
 38
 The employees have not directed our attention to any legislative history that reveals a contrary intent. We doubt that they could. See City of Memphis v. Greene, 101 S.Ct. at 1603 (White, J., concurring) ("nothing in the legislative history of this Act suggests that Congress was concerned with facially neutral measures which happened to have an incidental impact on former slaves"); Guardians Association, 633 F.2d at 267 (plaintiffs failed to cite and court unable to find any indication in legislative history that Congress intended to prohibit anything other than racially motivated refusal to treat nonwhites and whites alike).
 
 
 39
 We acknowledge that the legislative history does not reveal a direct refusal to extend section 1981 to nonpurposeful conduct. Given the absence of a congressional declaration of intent to extend the 1866 Act to the effects of facially neutral conduct, however, we believe that it is more consistent with the language of and impetus behind that statute to conclude that the statute is directed only at purposeful conduct. We reach this conclusion fully aware that neither the language nor the legislative history provides certain guidance in interpreting section 1981. As we noted at the beginning of this discussion, however, the conclusion we reach is one concurred in by nearly every circuit that has addressed the question since Washington v. Davis.
 
 D.
 
 40
 Furthermore, we believe that policy considerations support this conclusion. In rejecting a discriminatory impact standard for fourteenth amendment claims, the Supreme Court noted that such a standard might "invalidate a whole range of tax, welfare, public service, regulatory, and licensing statutes that may be more burdensome to the poor and to the average black than to the more affluent white." Washington v. Davis, 426 U.S. at 248, 96 S.Ct. at 2051. Applying an impact standard to section 1981 raises similar concerns. In significant measure, an impact standard would have the very consequences that the Supreme Court sought to avoid in Washington v. Davis. In fact, because section 1981, unlike the fourteenth amendment, covers not only governmental but also private conduct, an impact standard applied to section 1981 could be more intrusive than would one applied to the fourteenth amendment. See Heiser, supra, at 245-46. We do not address whether Congress could pass legislation under the thirteenth amendment requiring proof of impact only. Without, however, a clear indication that Congress intended section 1981 to reach nonpurposeful conduct or neutral regulations having a disproportionate impact, we are reluctant to ignore the concerns voiced in Washington v. Davis.
 
 
 41
 Furthermore, we reject the employees' contention that section 1981 liability is coextensive with liability under title VII. The remedies provided under the two statutes are "separate, distinct, and independent." See Johnson v. Railway Express Agency, 421 U.S. 454, 461, 95 S.Ct. 1716, 1720, 44 L.Ed.2d 295 (1975). The detailed administrative procedures through which a title VII claim is intended to pass, the limitation of title VII's coverage to discrimination in the area of employment, and the language of title VII distinguish title VII from section 1981. See Guardians Association, 633 F.2d at 267. The availability of title VII relief for nonpurposeful treatment having a disproportionate impact does not in any way demonstrate that such relief is available under section 1981. In fact, Congress' choice of a much more detailed procedure for pursuing title VII employment claims-which may be proved by disproportionate impact alone-supports the wisdom of our declining to assume that Congress intended section 1981 to cover the same conduct.
 
 E.
 
 42
 We hold that section 1981's reach does not extend to facially neutral conduct having the consequence of burdening one race more than the other. We believe that the language of the statute, its history, and the policy considerations we have addressed suggest that section 1981's broad sweep is one directed to intentional discrimination. We recognize that disproportionate impact is a significant issue in the achievement of racial equality in today's job market. Even under the standard we announce, however, disproportionate impact may be an important factor in proving racially discriminatory intent. See Village of Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 266, 97 S.Ct. 555, 564, 50 L.Ed.2d 450 (1977); Washington v. Davis, 426 U.S. at 242, 96 S.Ct. at 2049. In fact, if the pattern of disparity is sufficiently stark and unexplainable on grounds other than race, impact alone may demonstrate in the rare case the existence of discriminatory intent. Village of Arlington Heights, 429 U.S. at 266, 97 S.Ct. at 564.
 
 F.
 
 43
 In this case, the district court determined that the employees' evidence of disproportionate impact since September 1965 was not so dramatic or unexplainable that an inference of discriminatory intent could be made under section 1981. It also determined that, although the employees had shown some individual acts of discrimination prohibited by section 1981, the sum of the evidence demonstrated neither a policy of intentional race discrimination nor a pattern or practice of purposeful discrimination against the class. We have reviewed the employees' claims on appeal and we have not been persuaded to disturb the district court's conclusion that the employees' proof was insufficient to prove purposeful racial discrimination against the class of black employees, as prohibited by section 1981. Furthermore, we find no error in the district court's conclusion that Davis and DeBose failed to prove intentional discrimination regarding their individual claims and that Travis also failed to prove such discrimination except as to discipline, harassment, and retaliation. We hold that the court did not err in concluding that the employees did not prove their claim that Boeing Vertol engaged in purposeful discrimination, in violation of 42 U.S.C. § 1981, against the class of black employees.
 
 IV. TITLE VII CLAIMS
 
 44
 The district court concluded that the employees failed to prove that Boeing Vertol had engaged in a pattern or practice of race discrimination in (1) hiring, (2) initial placement and promotion, (3) layoffs, (4) maintenance of a job classification structure known as the "job family system," (5) promotion to supervisory and lead positions, and (6) discipline and harassment of employees. On appeal, the employees do not challenge the district court's rejection of the claims regarding hiring, layoffs, and the job family system. They raise challenges, however, to the court's rejection of their claims related to initial placement, promotion to supervisor and leadman, and discipline and harassment. The employees assert that the court erred in refusing to consider title VII claims that arose prior to March 23, 1968. They also contend that the court erred in applying the appropriate standards of proof to their title VII claims and that the court erred in making certain findings of fact in the three areas of alleged classwide discrimination addressed on this appeal.
 
 A. Statute of Limitations
 
 45
 The district court determined that all title VII claims that did not accrue after March 23, 1968 were barred by the statute of limitations. It calculated this date based on the then-applicable ninety-day limitation period for filing title VII charges with the EEOC and on Croker's June 19, 1968 filing date. See 42 U.S.C. § 2000e-5(e).[9] The court considered events prior to March 23, 1968 "to some extent in deciding issues of racial motivation," but not as direct evidence of title VII violations. See 437 F.Supp. at 1181.
 
 
 46
 The employees do not dispute that they were required to prove title VII violations after March 23, 1968. They contend, however, that conduct prior to a title VII cutoff date is actionable when the conduct is part of a continuing violation extending into the actionable period. Thus, the employees contend that the district court should have found violations of title VII from proof relating to conduct as of July 2, 1965, the effective date of the statute.
 
 
 47
 As the employees appear to recognize, the "critical question" in assessing the relevance of prelimitation discriminatory practices "is whether any present violation exists." United Air Lines v. Evans, 431 U.S. 553, 558, 97 S.Ct. 1885, 1889, 52 L.Ed.2d 571 (1977) (emphasis in original).
 
 
 48
 A discriminatory act which is not made the basis for a timely charge is the legal equivalent of a discriminatory act which occurred before the statute was passed. It may constitute relevant background evidence in a proceeding in which the status of a current practice is at issue, but separately considered, it is merely an unfortunate event in history which has no present legal consequences.
 
 
 49
 Id.; see Hazelwood School District v. United States, 433 U.S. 299, 309-10 & n.15, 97 S.Ct. 2736, 2742-43, 53 L.Ed.2d 768 (1977); Jewett v. International Telephone & Telegraph Corp., 653 F.2d 89, 93 (3d Cir. 1981); Masco v. United Airlines, 574 F.2d 1127, 1130-31 (3d Cir. 1978).
 
 
 50
 To the extent the district court was correct in concluding that the employees failed to prove the existence of title VII violations during the actionable period, therefore, the evidence related to the prior period could only reflect "an unfortunate event in history" entitled to consideration as "background evidence." See Hazelwood School District, 433 U.S. at 309-10 & n.15, 97 S.Ct. at 2742-43; Evans, 431 U.S. at 558, 97 S.Ct. 1889. Only if we conclude that the employees proved certain title VII violations during the actionable period will it be necessary to examine the relevance of pre-March 1968 evidence.
 
 B. Class Claims
 1. Standard of Proof
 
 51
 In a title VII action alleging classwide discrimination, the plaintiff class must "establish by a preponderance of the evidence that racial discrimination was the company's standard operating procedure-the regular rather than the unusual practice." See International Brotherhood of Teamsters v. United States, 431 U.S. 324, 336, 97 S.Ct. 1843, 1855, 52 L.Ed.2d 396 (1977). A title VII action may be brought under two theories-disparate treatment or disparate impact. Either theory may be applied to a set of facts. See id. at 335-36 n.15, 97 S.Ct. at 1854. When plaintiffs allege classwide racially discriminatory treatment in violation of title VII, proof of discriminatory motive is essential, although the burden may be met in some situations by presentation of statistical evidence that permits an inference of racial discrimination. See id.; Wetzel v. Liberty Mutual Insurance Co., 508 F.2d 239, 259 (3d Cir.), cert. denied, 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 679 (1975). Ordinarily, however, plaintiffs will present individual testimony that brings "the cold numbers convincingly to life." See Teamsters, 431 U.S. at 339, 97 S.Ct. at 1856. In this case, most of the employees' evidence was statistical, although individual employees also testified to illustrative individual acts of discrimination. While not all of this evidence was credited by the district court, the claims of several individuals were proved.
 
 
 52
 Once a plaintiff class has made out a prima facie case of discriminatory treatment, the burden shifts to the defendant to rebut the inference of discrimination by showing that the statistics are misleading or inaccurate, or by presenting legitimate, nondiscriminatory reasons for the disparity. See Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981); Wetzel, 508 F.2d at 259. It is now clear that a defendant's burden is one of production, not persuasion. It is sufficient to meet that burden if the defendant's admissible evidence clearly "raises a genuine issue of fact as to whether it discriminated against the plaintiff." See Burdine, 101 S.Ct. at 1094.
 
 
 53
 If a defendant meets its burden of rebutting a plaintiff's prima facie case, the plaintiff may show that the asserted explanations are inaccurate or are otherwise unworthy of credence, or the plaintiff may attempt to prove that a discriminatory reason more likely than not motivated the employer. See id. at 1095. The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiffs remains at all times with the plaintiffs. See id. at 1093.
 
 
 54
 Plaintiffs may also seek to prove title VII violations by challenging "practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity." Teamsters, 431 U.S. at 335-36 n.15, 97 S.Ct. at 1855; Griggs v. Duke Power Co., 401 U.S. 424, 431, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971). Under the disparate impact theory, once a plaintiff makes out a prima facie case of disproportionate impact-that black employees "suffered substantially disproportionate effects from the application of a seemingly neutral policy," see EEOC v. Greyhound Lines, Inc., 635 F.2d 188, 191 (1980)-a defendant must offer evidence to show that the challenged requirement or device has a manifest relation to employment. See Albemarle Paper Co. v. Moody, 422 U.S. 405, 425, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280 (1975); NAACP v. Medical Center, Inc., No. 80-1893, slip op. at 23-24 (3d Cir. June 29, 1981) (en banc).
 
 
 55
 As with claims of discriminatory intent, the burden of persuasion remains at all times with the plaintiff. See id., slip op. at 27. Thus, the defendant need only come forward with evidence to meet the inference of discrimination raised by the prima facie case. The plaintiffs may then demonstrate that the employer's reason is a pretext for discrimination and that "a feasible yet less onerous alternative exists." See id., slip op. at 25.
 
 
 56
 With these standards of proof in mind, we proceed to examine the employees' contentions on appeal regarding their classwide claims of racially discriminatory treatment in initial placement, promotion, and discipline. While we have considered carefully each of the employees' contentions, we address in this opinion only those contentions of some significance.
 
 2. Factual Background
 
 57
 The nature of Boeing Vertol's business has resulted in vast fluctuations in the size of its workforce. Significant layoffs can follow periods of active hiring; hiring and layoff can also occur at the same time, depending on the employee skills required in different phases of production. In 1960, Boeing Vertol employed 2500 persons. That number swelled to 12,500 in 1967 and decreased to 5200 in 1972. The district court found that the hiring of the early- to mid-1960's determined, to a large extent, the composition of the workforce for at least the decade that followed.
 
 
 58
 The nature of Boeing Vertol's business has also created a critical need to ensure quality, meet schedules, and maintain reasonable costs. Boeing Vertol thus normally hires skilled and experienced workers for specific job openings. It nevertheless hires some inexperienced workers as "learners." Production and Maintenance (P&M) employees constitute nearly half of Boeing Vertol's workforce. P&M employees are covered by a collective bargaining agreement between the Union and Boeing Vertol. The agreement divides P&M jobs into 200 classifications, each of which has an assigned labor grade. Job classifications are grouped into approximately sixty job families on the basis of common functions. The collective bargaining agreement governs the rights of union employees to transfer and to be promoted.
 
 
 59
 Black employees have comprised as little as four percent of the Boeing Vertol workforce (1962) and as much as 8.4% of the workforce (1968). Between 1965 and 1974, however, 17.9% of the P&M hires were black. The percentage of black P&M hires exceeded the percentage of blacks in the Philadelphia Standard Metropolitan Statistical Area in every year from 1967 to 1974 for which there were statistically significant data. Layoffs have tended to affect black employees disproportionately because of their lack of seniority in comparison with whites.
 
 3. Initial Placement
 
 60
 The employees presented several statistical studies to prove their claim that Boeing Vertol had engaged in racial discrimination in the initial placement of employees. A 1967 study, for example, revealed that the median labor grade for whites was 6, while the median grade for blacks was 5. This study, like a great deal of the employees' evidence, reflected the consequences of and events occurring before the actionable period. Labor-grade distribution studies for later periods also revealed disparities adverse to black employees, but again these studies tended to reflect disparities created or caused by events occurring before the actionable period rather than discriminatory placement occurring after March 1968. See Teamsters, 431 U.S. at 360, 97 S.Ct. at 1867.
 
 
 61
 The employees also presented some statistics showing disparities in initial placement occurring after 1968, which would be directly relevant to a claim of discriminatory initial placement during the actionable period. In rebuttal, however, Boeing Vertol contended that the statistical disparities could be explained by the indicated preferences of and the varying qualifications of employees being initially placed. It offered a 1971 study purporting to support this contention. The employees assert that the court found that Boeing Vertol's personnel office directed applicants to indicate certain job choices. They therefore contend that the court was precluded from relying on employee preference to explain statistical disparity. The court actually found that "at least some applicants were advised by interviewers to specify certain job choices." 437 F.Supp. at 1189 (emphasis added). Although the court considered the correlation between preference and placement to be partially explained by this practice, and it also recognized that preference could not serve to explain entirely the disparities because some jobs had several classifications at different labor grades, it was not precluded from nevertheless considering the correlation to be a "logical explanation for some disparities in placement." Furthermore, Boeing Vertol demonstrated problems with the way certain jobs were categorized in the employees' statistical analysis. The court therefore determined that the employees' evidence was "somewhat arbitrary" and was not entirely persuasive.
 
 
 62
 It appears that the bulk of the evidence relating to discrimination in initial placement was outside the actionable period, and that Boeing Vertol offered logical, nondiscriminatory reasons that tended to explain disparities that were shown as of March 1968. It also identified certain weaknesses in the statistics, which tended to lessen their probative value as to a claim of significant disparate impact after March 1968. We therefore cannot say that it was improper for the district court to conclude, based upon all the evidence and in light of the employees' burden of persuasion, that the employees failed to prove a pattern or practice of racial discrimination in initial placement.
 
 
 63
 4. Promotion to Supervisory and Lead Positions
 
 
 64
 P&M leadmen are employees within a job classification who are selected by first level supervisors to perform certain extra duties for a small additional hourly wage. There are also several layers of supervisors: first-level supervisors, general foremen, superintendents, and unit chief managers. A Supervisory Selection Board must approve promotions to supervisor. Beginning in 1967, Boeing Vertol implemented a requirement that the Supervisory Selection Board consider black candidates whenever a supervisory position was open. Also in 1967, black management employees began participating in the Supervisory Selection Board meetings, although there were no black Board members. Nevertheless, a 1972 review conducted by Boeing Vertol concluded that Boeing Vertol's supervisory selection process permitted the use of inconsistent selection criteria, perpetuation of individual bias, and exclusion from consideration of many potential candidates.
 
 
 65
 The employees presented statistical evidence demonstrating, in at least some years during the actionable period, significant disparities between the percentages of black employees in the workforce and in P&M jobs and the percentages of black leadmen and supervisors. They supported this statistical evidence with individual testimony describing discriminatory denials of promotions. The employees also presented evidence that the promotion system, which operated in a subjective fashion without written standards, afforded an opportunity to discriminate. The district court found that certain individuals proved some of these claims.
 
 
 66
 With regard to the employees' claim of discrimination in supervisory promotions, the district court made a significant finding:
 
 
 67
 The percentage of black managers at Boeing Vertol has been rising steadily since 1967. The percentage of supervisory appointments offered and accepted by black employees has exceeded their representation in the workforce since 1967. From the beginning of 1967 through the summer of 1968, blacks constituted 19 percent of the appointments to P & M supervision. In P & M, blacks have constituted 16 percent of all supervisory selections since 1967. For all management positions, blacks accounted for nearly twenty percent of the increase in managers between 1970 and 1974.
 
 
 68
 437 F.Supp. at 1163 (Finding of Fact 105). The court determined that this evidence effectively rebutted any inference of discrimination that might otherwise be permissible from the significant disparities reflected in the employees' statistics.
 
 
 69
 The employees contend that the court's finding was clearly erroneous. In considering this contention, we "accept the ultimate factual determination of the fact-finder unless that determination is (1) completely devoid of minimum evidentiary support displaying some hue of credibility, or (2) bears no rational relationship to the supportive evidentiary data." Krasnov v. Dinan, 465 F.2d 1298, 1302 (3d Cir. 1972); see Kunda v. Muhlenberg College, 621 F.2d 532, 544 (3d Cir. 1980). The question is not whether we would have made the same factual finding but whether on the entire evidence we are "left with the definite and firm conviction that a mistake has been committed." See Jackson v. United States Steel Corp., 624 F.2d 436, 439 (3d Cir. 1980) (quoting United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)).
 
 
 70
 Applying this standard, we cannot declare clearly erroneous the district court's finding that since 1967 Boeing Vertol had appointed black supervisors at a rate exceeding their representation in the workforce. Ronald James, a Boeing Vertol manager who served on the Supervisory Selection Board during the actionable period, testified that during the relevant period sixteen percent of the candidates recommended by the Board for appointment as supervisors were black. A list of P&M supervisory promotions made during 1968 and 1969 showed that seventeen percent of the promotions went to black employees during this period. Although, as the district court noted, Boeing Vertol's evidence was "not particularly strong," the factual finding by the district court was not without evidentiary support. Furthermore, the employees failed to offer proof that served to rebut this finding.
 
 
 71
 The district court also gave some probative weight to other explanations for the disparities. For example, the pattern of hiring at Boeing Vertol was such that the pool of experienced workers, the most likely candidates for supervisory positions, had a greater percentage of white employees than did the overall workforce. Additionally, a drastic reduction in the number of supervisory positions in the later 1960's and early 1970's resulted in the demotion of less senior supervisors. The formula by which the employees reached an "expected number" of black supervisors in a given year also tended to inflate the expectation figure because it relied on incorrect assumptions about the composition of the P&M supervisory workforce in relation to the overall supervisory workforce. These explanations served to make credible Boeing Vertol's contention that the statistical disparity did not reflect discriminatory promotions. Particularly in light of the absence of evidence directly contradicting Boeing Vertol's figures, we cannot say that we are "left with the definite and firm conviction that a mistake has been made."
 
 
 72
 The employees also presented evidence of a statistically significant disparity between the number of black leadmen and the number of blacks in the workforce from 1966 through 1969. An analysis conducted at the end of 1967 also showed that white employees who were selected as leadmen had an average of one year less experience than black employees selected as leadmen. This study, however, like some of the other evidence revealing significant disparities, covered events occurring before the actionable period.
 
 
 73
 In rebuttal, Boeing Vertol presented evidence attempting to explain the disparities on the basis of hiring patterns and experience requirements. For example, Boeing Vertol presented a study purporting to show that employees generally had over six years experience when appointed to the lead position. Although the district court determined that the study was not entirely persuasive, because it was based on employees' most recent appointments rather than on their first appointments, the court was persuaded that the lack of experience of many black employees at the time in question could account for much of the apparent disparity. Thus, when the court took into account the company's written description of the lead position, requiring five or more years in an occupation before selection as a leadman, the statistical disparity essentially disappeared.[10]
 
 
 74
 The employees challenge the district court's reliance on this five-year requirement to determine that leadmen were not selected discriminatorily. They contend that the written policy was not followed. At trial, they presented evidence that some white employees were made leadmen within one or two years of being hired. Thus, they contend, it was error to accept lack of experience as a reasonable explanation for the disparity. They contend that the experience requirement was a pretext for discrimination.
 
 
 75
 The district court found that the written five-year job-experience requirement was not strictly enforced, and also assigned minimal probative value to Boeing Vertol's study attempting to prove that employees assigned to lead positions had an average of six years of experience. The court, however, did not determine that experience was an irrelevant consideration. To the contrary, the court concluded that "it was clear from the evidence that most leadmen and supervisors had at least several years experience when appointed." 437 F.Supp. at 1190. The employees do not suggest that this conclusion was erroneous. Nor did they at trial demonstrate that experience was an unimportant consideration in selection of leadmen.
 
 
 76
 The employees' statistical determination of the number of expected black leadmen in any given year was based on the number of blacks in the workforce without regard to experience. This method resulted in inflated expectation figures. For example, although the employees' leadmen statistics revealed no significant disparity in 1965, a significant disparity appeared in 1966 when the black workforce doubled while the number of black leadmen did not.
 
 
 77
 "(S)tatistics are not irrefutable; ... their usefulness depends on all of the surrounding facts and circumstances." Teamsters, 341 U.S. at 340, 97 S.Ct. at 1857. In light of all of the facts and circumstances, we find no error in the court's conclusion that the employees failed to prove "more than isolated ... or sporadic discriminatory acts," and that they failed to prove that racially discriminatory denials of lead promotions were the company's "standard operating procedure-the regular rather than the unusual practice." See id.
 
 5. Discipline and Harassment
 
 78
 Employee reports, which are issued by first-level supervisors, record reprimands and disciplinary actions. The work rules and appropriate punishments are posted, but during the relevant period no written standards covered the issuance of employee reports. Thus, a supervisor's discretionary judgment controlled whether or not to write up an employee report, although the approval of the Labor Relations Office was required before a report could issue and become part of an employee's file. Employee reports are kept in two employee folders and are supposed to be expunged at certain intervals, although this is not always done. Disciplinary sanctions range from oral warnings, to reprimands, to disciplinary actions, to discharges. Absence from work is the most common reason for issuance of an employee report, with the data regarding attendance being obtained from time-clock records.
 
 
 79
 The employees presented evidence to show that black employees received a disproportionate number of reprimands and disciplines. The court found that the data showed a statistically significant disparity in every year from 1966 to 1971, the year in which this action was filed. 437 F.Supp. at 1138. For example, in 1969 thirteen percent of the P&M employees were black, but they received 28.6% of the reprimands, 29.8% of the disciplines, and 30% of the severe disciplines.[11] The court also found that two black employees suffered racial harassment by white supervisors.
 
 
 80
 Boeing Vertol presented data comparing the percentage of new hires who were black to the percentages of reprimands and disciplines to blacks, in an effort to correlate inexperience with disciplinary actions. Thus, in 1969, the sample year discussed above, 20.4% of all new hires were black, which significantly reduced-although it did not eliminate-the disparity apparent in the employees' statistics. Boeing Vertol did not produce data to prove its underlying assumption that new employees had more disciplinary problems than other employees. It presented testimony, however, that there was a high rate of attendance problems with minority employees during periods of active hiring, and the district court found that attendance was the most common disciplinary problem. Boeing Vertol also presented evidence showing that it had a corporate policy, which it actively enforced, against harassment of minority employees, that supervisors had been disciplined for using improper language with employees, and that supervisors were required to attend sensitivity programs to make them aware of the problems of black employees.
 
 
 81
 The district court concluded that the employees had failed to meet the burden of proving " 'more than isolated or "accidental" or sporadic discriminatory acts' " and that they had not established by a preponderance of the evidence that racial discrimination in harassment and discipline was the company's standard operating procedure. 437 F.Supp. at 1191 (quoting Teamsters, 431 U.S. at 336, 97 S.Ct. at 1855). With regard to the claim of classwide harassment, the court noted, and we concur, that much of the supporting testimony was "vague as to the time and place and persons involved," concerned events occurring before March 1968, and was related to individual actions not necessarily demonstrating a pattern or practice of racial harassment.
 
 
 82
 Regarding the class claim of discriminatory discipline, the court noted that the employees had failed to rebut Boeing Vertol's statistical evidence correlating discipline with new hires. It considered inexperience to be "as reasonable an explanation of the disparities as is race." 437 F.Supp. at 1191-92. Although the court found that the subjective judgment of supervisors was controlling in issuing employee reports, it considered Boeing Vertol's safeguards against arbitrary action and its policy against racial harassment to be a significant factor in interpreting the discipline statistics. It was persuaded that the statistics could be partially explained by the hiring patterns of Boeing Vertol. Furthermore, it was not presented with more than isolated evidence tending to prove the black employees were reprimanded or disciplined when they did not deserve such treatment, or that white employees who violated company rules went unpunished. See 3 Larson, Employment Discrimination § 86.10 (1981) (importance of proof that white employees not disciplined or disciplined differently for same conduct).
 
 
 83
 The employees contend that individual acts of harassment and wrongful discipline supported their claim that Boeing Vertol engaged in a pattern or practice of such discrimination. The court found that two employees, Croker and Travis, proved individual claims of discriminatory harassment. In light of Boeing Vertol's corporate policy against racial harassment and its affirmative steps taken to implement this policy, which included disciplining white supervisors who engaged in these practices, the court was not required to infer a pattern or practice of classwide harassment from the isolated actions of individual supervisors. See, e. g., DeGrace v. Rumsfeld, 614 F.2d 796, 805 (1st Cir. 1980).
 
 
 84
 Finally, the employees do not contest the finding of the district court that "(t)he goal of the Company's disciplinary system is to provide employees with an opportunity to correct deficiencies in work or behavior," or the court's finding that discipline was a serious problem to Boeing Vertol in the late 1960's. See 437 F.Supp. at 1152-53. The record supports a conclusion that the disciplinary system had a manifest relation to legitimate employment goals, even if those goals did not actually require implementation of the exact systems being challenged. Thus, even if the employees established a prima facie case, they failed to carry their ultimate burden of proving a title VII violation. See New York Transit Authority v. Beazer, 440 U.S. 568, 587 n.31, 99 S.Ct. 1355, 59 L.Ed.2d 587 (1979). See also NAACP v. Medical Center, Inc., No. 80-1893, slip op. at 26 (discussing burdens on plaintiffs).
 
 
 85
 We cannot conclude that the court erred in its determination that the employees failed to prove that Boeing Vertol engaged in a pattern or practice of racial discrimination in harassment and discipline. We agree with the employees that they presented a substantial statistical case, but the statistics in this case were not explainable only on the basis of racial discrimination. The district court was in the best position to evaluate the evidence of conflicting explanations for the disparities, and we do not find that it erred in the evaluation it ultimately made.
 
 6. Summary
 
 86
 To a large extent, the statistical disparities shown by the employees did not actually reflect disparities created during the actionable period. Furthermore, to the extent they did, they were explainable on grounds other than racial discrimination. Statistics have a significant place in title VII litigation, particularly in class actions. See Wetzel v. Liberty Mutual Insurance Co., 508 F.2d at 259. Nevertheless, statistical disparities may often be explained on the basis of several reasonable explanations, and "(i)n the area of employment, with its complexities and variables, statistics must be analyzed with careful attention both to supportive and opposing facts." Id. (quoting Pettway v. American Cast Iron Pipe Co., 494 F.2d 211, 230-31 n.44 (5th Cir. 1974)). The district court was presented with a comprehensive picture of employment practices at Boeing Vertol. The employees and Boeing Vertol offered differing explanations for the statistical disparities displayed by the employees' evidence, and they presented other evidence, including illustrative individual testimony, in support of their theories. It is clear that the employees proved several individual acts of discrimination, but a pattern or practice of racial discrimination in employment cannot be extrapolated from a few isolated incidents. The district court explained its conclusion:
 
 
 87
 That is not to say, however, that Boeing Vertol has been completely free from discrimination. Rather, my holding is only that the plaintiffs have failed to prove that Boeing Vertol engaged in a pattern or practice of discrimination, as that term has been defined by the Supreme Court in International Brotherhood of Teamsters (v. United States, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977)).
 
 
 88
 437 F.Supp. at 1192. In view of the district court's responsibility to evaluate all the evidence before it, the employees' burden of persuasion, and our limited review of factual findings, we cannot conclude that the district court erred in its holdings.
 
 C. Individual Claims
 
 89
 The district court dismissed the claims of Ferrell and Dixon because they were not named plaintiffs but rather were class-member witnesses whose classwide claims had been unsuccessful. The employees contest this dismissal.
 
 
 90
 In Dickerson v. United States Steel Corp., 582 F.2d 827 (3d Cir. 1978), this court held:
 
 
 91
 An individual class member, who has not presented any evidence of having satisfied the jurisdictional prerequisites in his own name and who is not a named plaintiff in the class action, may not be entitled to relief for an individual claim of discrimination, if the class-wide claim encompassing his individual claim on that issue is dismissed.
 
 
 92
 Id. at 834 (emphasis in original). Although the employees do not challenge the holding in Dickerson, they attempt to distinguish that case on its facts. We believe, however, that Dickerson pronounced a clear rule of law applicable to this case. The appropriate means by which unsuccessful class members may adjudicate their individual claims is by motion for intervention under Federal Rule of Civil Procedure 24(b), after which the district court, in its discretion and considering the possibility of undue delay and prejudice, may grant the motion. We affirm the district court's holding that the class-member witnesses, who were not named plaintiffs in this unsuccessful class action and who did not seek to intervene in this action, were not entitled to individual relief.[12]
 
 
 93
 We have reviewed the other claims of error concerning the individual claims of Travis, DeBose, Davis, and Dockins, and we find no reversible error.[13]
 
 V. COSTS
 
 94
 In its 1977 order awarding the right to attorney's fees and costs to the prevailing individual plaintiffs, the district court also ordered that "defendant Boeing Company is entitled to costs from plaintiff DeBose and the class." No. 71-2168 (E.D.Pa. Nov. 17, 1977) (order). Its opinion accompanying that order explained that "the Boeing Company will be able to recover its costs for its defense in the class action part of the case and for its defense against the claims by Mr. DeBose." 444 F.Supp. 890, 895 (E.D.Pa.1977).
 
 
 95
 The employees seek to have the award of costs to Boeing Vertol overturned. They contend that costs should be assessed against a losing title VII plaintiff only when the plaintiff has brought an action that is frivolous, unreasonable, or without foundation. Thus, they seek to apply to the assessment of costs the standard for assessing attorney's fees against a losing title VII plaintiff. See Christianburg Garment Co. v. EEOC, 434 U.S. 412, 421, 98 S.Ct. 694, 700, 54 L.Ed.2d 648 (1978); United States Steel Corp. v. United States, 519 F.2d 359, 364 (3d Cir. 1975).
 
 
 96
 Costs, unlike attorney's fees, are awarded to a prevailing party as a matter of course, unless the district court directs otherwise. See Fed.R.Civ.P. 54(d). We do not believe that title VII carved out an exception to this rule. Even if we were persuaded that there should be such an exception, we believe it is for the rulemakers to decide. Thus, we do not agree with the employees that costs may be awarded to a prevailing title VII defendant only under unusual circumstances. See Jones v. City of San Antonio, 568 F.2d 1224, 1226 (5th Cir. 1978); Note, The United States as Prevailing Defendant in Title VII Actions: Attorneys' Fees and Costs, 66 Geo. L.J. 899 (1978). But see Dual v. Cleland, 79 F.R.D. 696, 697 (D.D.C.1978). See also Lewis v. St. Louis University, 635 F.2d 700, 701 n.2 (8th Cir. 1980) (cases divided on proper standard for awarding costs to title VII defendants).
 
 
 97
 This is not to say that a district court is without discretion in determining whether and to what extent it should award costs against a plaintiff. See, e. g., Farmer v. Arabian American Oil Co., 379 U.S. 227, 235, 85 S.Ct. 411, 416, 13 L.Ed.2d 248 (1964) (court's discretion to impose extraordinary costs should be used sparingly so as not to discourage litigation). The particular circumstances of a case may permit a district court to refuse to award costs altogether or to apportion them between the parties. See generally 10 Wright & Miller, Federal Practice & Procedure § 2668 (1973). We decide only that title VII plaintiffs enjoy no blanket protection from the provisions of rule 54(d).
 
 
 98
 We are unable to discern against whom the district court intended to tax the costs attributable to Boeing Vertol's defense of the class action. Because there might be significant objections to the award once it is clear who is liable for the costs, particularly in a 23(b)(2) class action, see, e. g., Gay v. Waiter's & Dairy Lunchmen's Union, 86 F.R.D. 500, 502 n.3 (N.D.Cal.1980), the district court should specify who will bear the burden of the costs awarded to Boeing Vertol. Whether certain of Boeing Vertol's costs should be disallowed as extraordinary or excessive is also a question that it may have to address. Thus, while we reject the employees' contention that title VII plaintiffs may not be assessed costs in the absence of extraordinary circumstances, we vacate the district court's award of costs in favor of Boeing Vertol and remand for clarification of the assessment of costs and to determine objections raised by the employees.
 
 VI.
 
 99
 The motion to dismiss portions of this appeal is denied. That part of the November 1977 order awarding costs to Boeing Vertol is vacated and remanded for proceedings consistent with this opinion. The judgment of the district court is affirmed in all other respects.
 
 
 100
 ALDISERT, Circuit Judge, concurring and dissenting, with whom A. LEON HIGGINBOTHAM, Jr., Circuit Judge, joins.
 
 
 101
 I join parts I, II, IV, and V of the majority opinion and dissent only from the majority's holding in part III that a plaintiff must prove a racially discriminatory purpose to establish a right to relief under 42 U.S.C. § 1981[1] for employment discrimination. I reach a contrary result for reasons of principle and policy; because of the desirability of clarity and understanding for the lay public, employees and employers alike; and because of the necessity for symmetry in the law of employment discrimination.
 
 I.
 
 102
 The § 1981 issue that divides this court today is solely one of statutory construction. I agree completely with the majority's observation that "neither the language nor the legislative history provides certain guidance in interpreting section 1981." Majority op. at 988. The traditional approaches of statutory interpretation-the mischief rule, the golden rule, the literal rule, and the plain meaning rule[2]-also furnish little help with this troublesome problem. This is because the problem of statutory construction before us is not a problem of language analysis in the strict sense, arising from the presence of an unclear norm, but a problem of a lacuna, a non-existent norm.[3]
 
 
 103
 This troublesome and recurring problem of statutory voids was recognized many decades ago by John Chipman Gray:
 
 
 104
 The fact is that the difficulties of so-called interpretation arise when the legislation has had no meaning at all; when the question which is raised in the statute never occurred to it; when what the judges have to do is, not to determine what the Legislature did mean on a point which was present to its mind, but to guess what it would have intended on a point not present to its mind, if the point had been present.[4]
 
 
 105
 When this occurs, I am inclined to follow what Professor Robert A. Leflar has described as the "sound law" approach: "sound in terms of the new use and demands of society as related to the particular area of law to which the statute refers."[5] I am also attracted by the formulation of Professor (now U.S. District Judge) Robert E. Keeton, who has taught that under the circumstances presented here, we should
 
 
 106
 aim for resolving the issue at hand so as to produce the best total set of rules, including those within the core area of the statute and other cognate rules of law, whatever their source. Defer to the statute's manifestations of principle and policy, as far as they can be ascertained. Accept the inapplicable statutory mandate as a datum. Accept other statutory directives and judicial precedents as data. Aim for a decision on this issue that will produce an evenhanded system for this issue and all the cognate issues that are answered in statutes and other precedents.[6]
 
 
 107
 I approach the solution to our immediate problem in the spirit of the Leflar and Keeton formulations.[7] This approach requires me to consider the field of employment discrimination law as a whole, and to consider § 1981 in conjunction with Title VII of the Civil Rights Act of 1964 and not separately or independently.
 
 II.
 
 108
 Both statutes provide federal remedies for racial discrimination in private and public employment. Title VII, the later of the two statutes, was not enacted in a vacuum; it was adopted with a clear recognition that § 1981 was already available as a remedy. The legislative history of Title VII discloses Congress' understanding "that the remedies available to the individual under Title VII are co-extensive with the individual's right to sue under the provisions of the Civil Rights Act of 1866, 42 U.S.C. § 1981, and that the two procedures augment each other and are not mutually exclusive." H.R.Rep.No.238, 92d Cong., 1st Sess. 19 (1971), reprinted in (1972) U.S.Code Cong. & Ad.News 2137, 2154.
 
 
 109
 Admittedly, the two remedies do not track each other precisely. "(A)lthough related, and although directed to most of the same ends, (they) are separate, distinct, and independent." Johnson v. Railway Express Agency, Inc., 421 U.S. 454, 461, 95 S.Ct. 1716, 1720, 44 L.Ed.2d 295 (1975). Section 1981 is more limited in that it prohibits only racial discrimination; Title VII encompasses discrimination because of sex, religion, and national origin. Section 1981 is not limited to employment discrimination; it has a much broader reach, not relevant for our purposes here. It does not exempt employers of fewer than fifteen persons, bona fide private membership clubs with less than twenty-five members, or religious groups employing workers in religion-oriented positions.[8] See Johnson, 421 U.S. at 460, 95 S.Ct. at 1720. It is not subject to the short limitations period of Title VII,[9] but is governed by the most closely analogous state statute of limitations. These are differences, to be sure, but I defend the thesis that these distinctions do not demand a difference in the elements of a claim for relief.
 
 
 110
 Recognizing that we are dealing with a lacuna, a void in the law, requiring us to divine somehow the legislative intent, we should candidly admit with Professor Gray that we are guessing what Congress would have intended "on a point not present to its mind." I believe it is entirely legitimate to regard our declared national policy of opposition to employment discrimination as a legitimate aid in solving this problem. With Roger J. Traynor I believe that dictates of public policy are legitimate tools in judicial decisionmaking when neither express statute nor relevant precedent furnishes an answer.[10] I am persuaded that public policy as manifested by congressional activity is to expand, and not to contract, the reach of statutes dealing with employment discrimination. Congress enacted massive amendments to Title VII in 1972,[11] extending that statute's protection to public employees,[12] but it did not tinker with the judicially-created impact standard.[13] I have not discovered any federal legislation that suggests or demands a more exacting standard of proof in employment discrimination cases under § 1981.
 
 
 111
 I have emphasized the technical differences between the two statutes deliberately, because I must assume that in enacting Title VII Congress also recognized the circumstances where the two remedies are congruent. A mere glance at the annotations to the two statutes clearly indicates that in most actions where § 1981 will apply, Title VII will also apply. In terms of modern commercial and industrial activities, a qualified plaintiff may utilize either statute as a remedial vehicle except in cases affected by the different periods of limitation. Because Congress enacted the newer statute to augment the older in the field of employment discrimination, I must conclude that it deliberately designed the twin remedies to cover the entire field of employment discrimination based on race.
 
 III.
 
 112
 I now turn to the mass of judicial decisions interpreting the legislative product. The fact is that the colossus of our employment discrimination law has not developed through judicial gloss being added to the language of § 1981, but rather to the text of Title VII. It has been Title VII, and not § 1981, that has served as the fountainhead of judicial lawmaking in the employment discrimination field. And like § 1981, Title VII contained lacunae.
 
 
 113
 The courts have already filled the Title VII lacunae. In an undeviating series of cases beginning with Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), the courts-not Congress-have established a dichotomy that recognizes claims established by proof of disparate impact as well as disparate treatment. Having fashioned this dichotomy and having affirmed and reaffirmed that discriminatory intent is not a necessary element of a Title VII claim, the courts should not now unduly complicate this very difficult and sensitive area of the law by requiring proof of intent in overlapping actions under § 1981. The courts should not take two pieces of legislation, each containing serious and identical voids, and without good reason fabricate different standards for proof of a violation.
 
 
 114
 I believe that there will be more predictability and reckonability to the law of employment discrimination, more understanding and societal acceptability by the lay public, including putative employees, employees, and employers alike, if there is consistency in the judicial interpretation of the two statutes. The interested lay public will not be able to understand that where a claim of discrimination antedates the limitation period of Title VII the employee must prove discriminatory intent for years one and two, but need only prove discriminatory impact for years three and four.
 
 
 115
 When the language of a statute is insufficient, the methods utilized by the courts to assist in the construction process are designed for one purpose-to ascertain the intent of Congress. Because I do not believe that Congress intended that § 1981 be interpreted in one way as to the standard of proof and Title VII in another, I would hold that the traditional wisdom that has emerged from the mass of judicial construction of Title VII should be applied to § 1981 cases as well. I believe that this is the sound approach, commensurate with the developing nuances of employment discrimination law, and sound in terms of societal claims, wants, and demands.
 
 
 116
 Racial discrimination can be the most virulent of strains that infect a society, and the illness in any society so infected can be quantified. Exposure to embarrassment, humiliation, and the denial of basic respect can and does cause psychological and physiological trauma to its victims. This disease must be recognized and vigorously eliminated wherever it occurs. But racial discrimination takes its most malevolent form when it occurs in employment, for prejudice here not only has an immediate economic effect, it has a fulminating integrant that perpetuates the pestilences of degraded housing, unsatisfactory neighborhood amenities, and unequal education.
 
 
 117
 Our profound national policy of opposition to racial discrimination must continuously and unstintingly concentrate on its eradication in employment. If the courts are to implement this policy in our function of interpreting relevant statutes, our compass must be constantly jammed in that direction, for there we find the better rule of law. Professor Harry W. Jones has reminded us:
 
 
 118
 A legal rule ... is a good rule ... when-that is, to the extent that-it contributes to the establishment and preservation of a social environment in which the quality of human life can be spirited, improving and unimpaired.[14]
 
 
 119
 The rule that I suggest meets this test. Accordingly, I would reverse the district court's judgment to the extent it held that the plaintiffs had to prove intentional discrimination in order to prevail in their § 1981 claims, and remand for further proceedings.
 
 
 120
 GIBBONS, Circuit Judge, with whom Judges A. LEON HIGGINBOTHAM, Jr., and SOLVITER join, dissenting in part:
 
 
 121
 I join in Parts I, II, IV and V of the opinion of the court, but dissent from the holding in Part III that a plaintiff relying on 42 U.S.C. § 1981 must establish a racially discriminatory purpose by direct evidence rather than a racially disparate impact in order to make out a prima facie case. Judge Aldisert's dissenting opinion makes the point that in interpreting an ambiguous statute judges should follow a "sound law" approach. It seems to me that the judges in the majority are doing just that. The difference between us is not in jurisprudential approach to the task of statutory interpretation, but in our respective enthusiasms for advancing the policy underlying both section 1981 and Title VII of the Civil Rights Act of 1964. Faced with an ambiguity, we chose to attribute to the legislators of 1866 an intention respecting the advancement of that policy consistent with our own views on it. The majority opinion, conceding ambiguity, concludes:
 
 
 122
 We think that it is more likely than not that the statute was addressed to such intentional conduct.
 
 
 123
 (P. 988). The wish, grounded in the majority's view of what the public policy concerning employment discrimination ought to be, is father to the thought. Judge Aldisert candidly acknowledges that his different interpretation proceeds from a different view of what that public policy ought to be. I share his viewpoint, and therefore acknowledge that I am not a completely unbiased observer of the legislative record of that revolutionary assembly, the first session of the Thirty Ninth Congress. Even acknowledging my own preconceptions about what the law ought to be, it seems to me unlikely that that first session intended to afford less protection against the exclusion of Blacks from opportunities for employment than the intention attributed, thus far, to the second session of Eighty Eight. Griggs v. Duke Power Co., 401 U.S. 424, (1971). The majority asserts:
 
 
 124
 We acknowledge that the legislative history does not reveal a direct refusal to extend section 1981 to nonpurposeful conduct. Given the absence of a congressional declaration of intent to extend the 1866 Act to the effects of facially neutral conduct, however, we believe that it is more consistent with the language of and impetus behind that statute to conclude that the statute is directed only at purposeful conduct. We reach this conclusion fully aware that neither the language nor the legislative history provides certain guidance in interpreting section 1981.
 
 
 125
 (At 988). Thus the majority relies both on statutory language and on presumed impetus. Reliance on statutory language does not advance the argument even a step, however, since it is conceded that the language is at best ambiguous.[1] In those circumstances it is certainly fair to look, as an aid to statutory construction, at the impetus behind the statute. But the majority opinion, rather than examining evidence of that impetus, relies on ipsi dixit :
 
 
 126
 The employees have not directed our attention to any legislative history that reveals a contrary intent. We doubt if they could.
 
 
 127
 (P. 987). This expression of doubt is buttressed by reference to a similar ipsi dixit in a concurring opinion by Justice White. But before one can rely on the supposed impetus for a statute's enactment as an aid to statutory construction, more is required than a statement of the conclusion.
 
 
 128
 When Congress convened in December, 1865, the Thirteenth Amendment had been ratified. The amendment borrowed the language of the Article VI of the Northwest Territories Ordinance of 1787,[2] thus overruling so much of Dred Scott v. Sanford, 19 How. 393 (U.S.1857), as held Article VI of the 1787 ordinance unconstitutional. The better part of the first session of the Thirty Ninth Congress was devoted to discussion, in one connection or another, of the manner in which a new social order would be constructed to replace the one which the slavery compromises of the 1787 Constitution had safeguarded in the South for 78 years. While in the abstract slavery as a legal status was abolished, in the concrete, Adam Smith's free labor principles still were not applicable to Blacks in the South. A new Congress, considerably more radical than that which sent the Thirteenth Amendment to the states, fell under the effective domination of the Joint Committee on Reconstruction, popularly known as the Committee of Fifteen.[3] That Committee was in turn dominated by a combination of radical and moderate Republicans bent on changing the actual as well as the theoretical status of Black laborers in the South. The session dealt with four interrelated matters, all directed in one way or another toward that end. These proposals were the Freedman's Bureau bill, which the Committee of Fifteen could not pass over President Johnson's veto; the Civil Rights Act of 1866,[4] passed over his veto, a constitutional amendment sponsored by John A. Bingham of Ohio but not recommended; and the Fourteenth Amendment, which Johnson could not veto. Both temporally and politically the four measures are related. The 1866 Civil Rights Act was not an isolated technical enactment on a narrow specific subject, but a statute intended by those in control of the levers of political power in Congress to effect a major revolution in the Southern social order.[5] One cannot consider the impetus behind the Civil Rights Act separately from the impetus behind the whole program of the majority of the Committee of Fifteen. In light of that whole program it seems a bit farfetched to suggest, as the majority does, that the statute was not intended to reach facially neutral conduct having a disproportionate impact upon the job opportunities of Blacks. A more rational conclusion is that the Congressmen and Senators who passed the Act despite President Johnson's effort to preserve the existing Southern social order, would, if they specifically addressed the issue, intend that Blacks need show no more than disparate impact to make out a prima facie case.
 
 
 129
 There is more evidence, however, than the general climate of the session. The working paper for the Committee of Fifteen was the Report of Maj. Gen. Carl Schurz on the Condition of the South.[6] That report dealt extensively with the difficulties federal officials were encountering in their effort to change to a free labor system. General Schurz noted:
 
 
 130
 That the result of the free labor experiment made under circumstances so extremely unfavorable should at once be a perfect success, no reasonable person would expect. Nevertheless, a large majority of the southern men with whom I came into contact announced their opinions with so positive an assurance as to produce the impression that their minds were fully made up. In at least nineteen cases out of twenty the reply I received to my inquiry about their views on the new system was uniformly this: "You cannot make the negro work without physical compulsion." I heard this hundreds of times, heard it wherever I went, heard it in nearly the same words from so many different persons, that at last I came to the conclusion that this is the prevailing sentiment among the southern people. There are exceptions to the rule, but, as far as my information extends, far from enough to affect the rule. In the accompanying document you will find an abundance of proof in support of this statement. There is hardly a paper relative to the negro question annexed to this report which does not, in some direct or indirect way, corroborate it.[7]
 
 
 131
 In face of the attitude described by General Schurz, access to employment opportunity, other than as a dependent plantation field hand, was a central concern of the majority of the Committee of Fifteen and of the Congressmen and Senators who voted to override Johnson's veto. They were not in the least ignorant of the manner in which facially neutral practices could mask the intent to confine Blacks to the status of field hand. Schurz attributed this intent to the overwhelming majority of Southerners and described at length statutes and ordinances, some of which were on their face discriminatory, and others of which were facially neutral. Addressing the problem of facially neutral measures, he noted:
 
 
 132
 What peculiar shape the reactionary movement will assume it is at present unnecessary to inquire. There are a hundred ways of framing apprenticeship, vagrancy, or contract laws, which will serve the purpose....[8]
 
 
 133
 Considering the central importance of Schurz' report in the deliberations of the first session of the Thirty Ninth Congress, and especially his explicit warning that facial neutrality could mask less than neutral purposes, the majority's reliance on the presumed impetus for the Civil Rights Act is, to put it mildly, misplaced. Certainly Schurz' warning about the ability of the reactionary movement to resort to facially neutral job requirements was a part of the overall impetus for the legislation.
 
 
 134
 The language of the statute as enacted is also significant when compared with its language as first introduced. As enacted, Section 1 provides:
 
 
 135
 That all persons born in the United States and not subject to any foreign power, excluding Indians not taxed, are hereby declared to be citizens of the United States; and such citizens, of every race and color, without regard to any previous condition of slavery or involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall have the same right, in every State and Territory in the United States, to make and enforce contracts, to sue, be parties, and give evidence, to inherit, purchase, lease, sell, hold and convey real and personal property, and to full and equal benefit of all laws and proceedings for the security of person and property, as is enjoyed by white citizens, and shall be subject to like punishment, pains, and penalties, and to none other, any law, statute, ordinance, regulation, or custom, to the contrary notwithstanding.[9]
 
 
 136
 In the version introduced in the Senate by Senator Lyman Trumbull of Illinois, before the language substantially as quoted above, an additional clause was included:
 
 
 137
 That there shall be no discrimination in civil rights or immunities among the inhabitants of any State or Territory of the United States on account of race, color, or previous condition of slavery.[10]
 
 
 138
 That clause remained in the bill as passed by the Senate. On March 13, 1866, Congressman James F. Wilson reported the bill with an amendment striking out the first clause and in that form passed in the House of Representatives.[11] The Senate accepted the amendment.[12] There is no legislative history pointing clearly to the intention of the House in striking out the clause dealing with discrimination.[13] Had the discrimination clause been retained, the argument that direct evidence of discriminatory intention was required for a prima facie case would be considerably stronger, textually at least. Unfortunately, so far as I know there is no hard evidence of the reasons for its deletion. It is at least arguable that the deletion was intended to strengthen Section 1 by emphasizing Congressional interest in effects rather than subjective intentions. Thus, the majority's ipsi dixit about the absence of legislative history ignores some history that is troublesome for its thesis that Congress must have intended to require direct evidence of subjective intention in order to make out a prima facie case.
 
 
 139
 But I do not rely on either the Schurz Report or the amendment to section 1 as certain guides to congressional intention on what constitutes a prima facie case, for even with them the ambiguity remains. The subject was not dealt with specifically. What I do rely on, and what is absolutely inescapable, is the plain fact that Sumner, Stevens et al. intended to accomplish the result of a change from a centuries old social system based on involuntary labor, with all the notions of racial unsuitability for the performance of anything but menial labor under close supervision, to the free labor system. Since the publication of Adam Smith's The Wealth of Nations in 1776 the free labor system had become the norm worldwide. There was opposition, of course, even among the Republicans.[14] The Committee of Fifteen was unable to pass the Freedman's Bureau bill over Johnson's veto, although a clear majority favored it. That bill would have placed accomplishment of the result in the hands of a federal agency. The willingness of the majority in Congress to go as far as proposed in the Freedman's Bureau bill speaks thunderously about the impetus behind the companion Civil Rights Act. If the judges in the majority do not hear that thunder today they have chosen to place cotton in their ears since the time this court decided Young v. International Telephone & Telegraph Co., 438 F.2d 757 (3d Cir. 1971). In Young v. International Telephone & Telegraph Co., this court held that section 1981 was not affected by the enactment of Title VII of the Civil Rights Act of 1964, 438 F.2d at 760, and that the conciliation feature of Title VII could be utilized by a court fashioning relief in a section 1981 cause. 438 F.2d at 764. Thus far, the majority does not purport to overrule completely Young v. International Telephone & Telegraph Co., which until today was the law of the circuit, although its holding is a major departure from the case's reconciliation of the 1866 and 1964 statutes. As Judge Aldisert points out, introduction of disharmony between the two statutes, in place of our former policy of reconciling them, is a disservice to the courts which must enforce them.
 
 
 140
 Section 1981 is a difficult statute to deal with in the present context for several reasons. The first reason is that although the social changes which were intended are crystal clear, the draftsmanship could have been better. To the announcement of national policy in Section 1, the 1866 draftsmen of the Civil Rights Act added criminal sanctions,[15] and an enforcement mechanism modeled on the Fugitive Slave Act of 1850.[16] When the codification movement gained a following in Congress, the substantive provisions, the criminal sanctions, and the enforcement mechanisms were distributed to different titles of the United States Code.[17] The distribution made it easy for courts to do what the majority has done: lift the text from its context and confine the search for meaning to specific words rather than overall intent. Moreover, the combination in a single statute of a substantive federal standard of conduct with a criminal enforcement mechanism created the possibility of confusion on issues such as prima facie case and burden of proof. In this case we are not dealing with what the government would have to show in order to avoid a directed verdict under 18 U.S.C. § 242, the criminal code descendant of the 1866 Act. The Act contemplated private civil as well as criminal enforcement. Issues such as the form of action for such private cases, and the quantity of proof sufficient to make out a prima facie case were not dealt with, for the good and sufficient reason that those questions were dealt with in the Process Act,[18] the Judiciary Act,[19] and the common law. The 1866 Congress expected that in filling in the interstices in civil litigation, the courts would do so mindful of the social purpose of the legislation. The majority ignores that purpose. Free to choose a rule with respect to the contents of a prima facie case of a Section 1981 violation, it chooses the one most likely to inhibit rather than advance that purpose.
 
 
 141
 The majority's decision is not, of course, the first time a federal court has chosen to give a less than generous reading to the social legislation of the Thirty Ninth and succeeding reconstruction era Congresses. When, following the election of 1876, a concensus emerged among those in control of the Executive and Legislative branches to give up on the great experiment of eliminating feudalism in the South, and to permit the restoration of most of the status quo ante bellum, the Supreme Court went along, interring the Civil Rights Acts in the tumulus of neglect.[20] They were not rediscovered for generations and the purpose of the Thirty Ninth Congress failed of accomplishment. The history of the Civil Rights Act from the 1880's to the 1960's serves to illuminate another unfortunate feature of the majority opinion. As a makeweight justification for its hostile interpretation of Section 1981, the opinion relies on Washington v. Davis, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), which holds that proof of discriminatory purpose is required for claims predicated upon the Fourteenth Amendment. For several reasons that reliance is peculiar. In the first place, Washington v. Davis does not deal with the question whether Congress may, in a statute enacted on the authority of Section 2 of the Thirteenth Amendment, or on the authority of the necessary and proper clause, or even on the authority of Section 2 of the Fourteenth Amendment, provide for liability based on proof of effects rather than intention. As recently as June 29, 1981, this court in banc, in National Association for the Advancement of Colored People v. The Medical Center, Inc., No. 80-1893 (3d Cir. June 29, 1981), expressly rejected the contention that Congressional authority was so limited. The opinion of the court ignores that holding, despite the fact that all the judges in the majority except one joined in it.[21] The vivid contrast in approach to the interpretation of these fairly analogous federal statutes underscores the point that Judge Aldisert makes. The majority's view of sound policy on access by the aged and the handicapped to medical services is different from its view of sound policy on access by minorities to employment opportunities. Thus it relies on Washington v. Davis as the beginning of the second post-reconstruction era, and a harbinger for the reinterment of the Civil Rights Acts. As a matter of prediction he may be right that the second reconstruction is over.[22] But sufficient to the day is the evil thereof. In National Association for the Advancement of Colored People v. The Medical Center, Inc., we refused to anticipate dire predictions about Supreme Court dismantling of statutes protecting the aged and the handicapped. I would do the same here.
 
 
 142
 In light of the clear purpose of the first session of the Thirty Ninth Congress of achieving the result of a change from a feudal to a free labor system, I would construe Section 1 of the Civil Rights Act of 1866 as permitting the establishment of a prima facie case of violation by a showing of disparate impact. Such a reading requires a reversal of the dismissal of the Section 1981 class action and a remand for reconsideration under the appropriate standard of proof.
 
 
 143
 The district court's award of damages and attorney's fees to plaintiffs Croker, Davis and Travis, based on a finding of intentional discrimination, should, of course, remain undisturbed.
 
 
 
 [1]
 The employees' claim under 42 U.S.C. § 1985, which was apparently based on allegations of a Union-Boeing Vertol conspiracy, was dismissed after the employees reached a settlement with the Union. This dismissal is not challenged on appeal
 
 
 [2]
 Boeing Vertol filed both a motion to dismiss portions of the appeal for lack of subject matter jurisdiction and a motion for leave to file a reply memorandum in support of its motion to dismiss. A reply memorandum accompanied the second motion. We herein grant the motion for leave to file a reply memorandum, and we consider the merits of the motion to dismiss
 
 
 [3]
 Although attorney's fees were granted under both statutes, we believe that there is no difference between the two statutes relevant to determining whether fees are "costs" within the meaning of the Federal Rules of Civil Procedure or are otherwise collateral to the merits of an action. See Obin v. District No. 9, Int'l Ass'n of Machinists, 651 F.2d 574, at 581 n.5 (1981)
 
 
 [4]
 The employees cite Davis v. County of Los Angeles, 566 F.2d 1334 (9th Cir. 1977), vacated as moot, 440 U.S. 625, 99 S.Ct. 1379, 59 L.Ed.2d 642 (1979), as persuasive authority for their claims that Washington v. Davis did not create a distinction between title VII and § 1981 liability and that disproportionate impact is sufficient under § 1981. See id. at 1340. In Craig v. County of Los Angeles, 626 F.2d 659 (9th Cir. 1980), cert. denied, 450 U.S. 919, 101 S.Ct. 1364, 67 L.Ed.2d 645 (1981), however, the Ninth Circuit noted that it was no longer bound by Davis v. County of Los Angeles and proceeded to hold that § 1981 employment discrimination claims are controlled by equal protection rather than title VII standards. See Craig, 626 F.2d at 668 & n.9
 
 
 [5]
 Boeing Vertol cites several cases in which this court has referred to §§ 1981 or 1982 as prohibiting "racially motivated" discrimination. See, e. g., Mahone v. Waddle, 564 F.2d 1018, 1029 (3d Cir. 1977) ("it is ... racially motivated refusal to make a contract which can cause harm"), cert. denied, 438 U.S. 904, 98 S.Ct. 3122, 57 L.Ed.2d 1147 (1978); Resident Advisory Bd. v. Rizzo, 564 F.2d 126, 140 (3d Cir. 1977) (requiring "something more than disproportionate impact" for §§ 1981 and 1982 and 13th and 14th amendments), cert. denied, 435 U.S. 908, 98 S.Ct. 1457, 55 L.Ed.2d 499 (1978). This language suggests an intent requirement, but it represents dictum not intended to be a holding of the court. We therefore decline to give it binding effect
 Boeing Vertol also refers to Supreme Court language suggesting that § 1982 extends only to "racially motivated" deprivations. See Jones v. Alfred H. Mayer Co., 392 U.S. 409, 421, 426, 88 S.Ct. 2186, 2193, 2196, 20 L.Ed.2d 1189 (§ 1 of 1866 Act "meant to prohibit all racially motivated deprivations of the rights enumerated in the statute") (emphasis in original). We believe, however, that it is clear that the Supreme Court has not decided the present issue. See City of Memphis v. Greene, 101 S.Ct. at 1596. See also New York Transit Auth. v. Beazer, 440 U.S. at 583-84, n.24, 99 S.Ct. at 1364-65.
 
 
 [6]
 Section 1981 provides:
 All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.
 
 
 [7]
 Civil Rights Act of 1866, ch. 31, § 1, 14 Stat. 27, reenacted, Civil Rights Act of 1870, ch. 114, §§ 16, 18, 16 Stat. 144 (codified at 42 U.S.C. §§ 1981, 1982 (1976))
 The 13th amendment provides:
 Section 1. Neither slavery nor involuntary servitude, except as a punishment for a crime-whereof the party shall have been duly convicted, shall exist within the United States or any place-subject to their jurisdiction.
 Section 2. Congress shall have power to enforce this article by appropriate legislation.
 U.S.Const. amend. XIII.
 
 
 [8]
 See, e. g., City of Memphis v. Greene, 101 S.Ct. 1584, 1603 (1981) (White, J., concurring); McDonald v. Santa Fe Trail Transp., 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976); Runyon v. McCrary, 427 U.S. 460, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976); id. at 192, 96 S.Ct. at 2605 (White, J., dissenting); Jones v. Alfred H. Mayer Co., 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968) (§ 1982). See also Comment, Section 1981, supra, at 35-61
 
 
 [9]
 The current version of 42 U.S.C. § 2000e-5(e) dictates a 180-day rather than 90-day limitation period
 
 
 [10]
 The court determined that in 1968, eight percent of the black workforce had the necessary experience. In 1968 7.45% of the lead positions were filled by black employees. 437 F.Supp. at 1161
 
 
 [11]
 The overall picture was clearly one of a disparity adverse to blacks. It should be pointed out, however, that several categories actually had an inadequate number of events from which to determine statistical significance. Furthermore, some categories actually showed a disparity adverse to whites
 
 
 [12]
 Because of our disposition of this issue, we need not address the district court's rejection, on the merits, of class-member John Edwards' claim of discriminatory denial of promotion
 
 
 [13]
 In a footnote in their briefs, the employees assert that the awards to Croker and Travis should be increased. They offer no guidance as to an appropriate increase. We find no reason to disturb the district court's determination of the recoverable damages proved by Croker and Travis
 
 
 [1]
 42 U.S.C. § 1981 provides:
 All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.
 
 
 [2]
 See H. Hart & A. Sacks, The Legal Process: Basic Problems in the Making and Application of Law 1144-46 (Cambridge Tent. ed. 1958), reprinted in R. Aldisert, The Judicial Process 175-77 (1976)
 
 
 [3]
 See M. Cappelletti, J. Merryman & J. Perillo, The Italian Legal System 253 (1967)
 
 
 [4]
 J.C. Gray, Nature and Sources of Law 172-73 (2d ed. 1921). See also W. Friedmann, Legal Theory 453 (5th ed. 1967), quoting Eyston v. Studd (Eng. 1574):
 (I)t is a good way, when you peruse a statute, to suppose that the lawmaker is present; and that you have asked the question you want to know touching the equity; then you must give yourself an answer as you imagine he would have done, if he had been present.
 
 
 [5]
 See Leflar, Statutory Construction: The Sound Law Approach, in R. Aldisert, The Judicial Process 177, 180 (1976)
 
 
 [6]
 Keeton, Statutes, Gaps, and Values in Tort Law, 44 J. Air Law & Commerce 1, 9 (1978)
 
 
 [7]
 This approach is similar to that prescribed in several European Civil Codes, which frankly and publicly recognize that situations will occur that were not within the contemplation of the legislative draftsmen. Perhaps the best known model is the Swiss Civil Code of 1907:
 Art. 1: The Code governs all questions of law which come within the letter or the spirit of any of its provisions.
 If the Code does not furnish an applicable provision, the judge shall decide in accordance with customary law, and failing that, according to the rule which he would establish as legislator.
 In this he shall be guided by approved legal doctrine and judicial tradition.
 The Austrian General Civil Code of 1811 provides:
 Sec. 7: Where a case cannot be decided either according to the literal text or the plain meaning of a statute, regard shall be had to the statutory provisions concerning similar cases and to the principles which underlie other laws regarding similar matters. If the case is still doubtful, it shall be decided according to the principles of natural justice, after careful research and consideration of all the individual circumstances.
 See also Article 6, Spanish Civil Code of 1889; Chap. 2, Article 12 of the Italian Code, Provisions on the Laws in General; and Article I of the 1951 Civil Code of Iraq. For English translations see R. Schlesinger, Comparative Law 228, 317, 602-03 (4th ed. 1980).
 
 
 [8]
 Compare 42 U.S.C. §§ 2000e(b), 2000e-1
 
 
 [9]
 See 42 U.S.C. §§ 2000e-5(e), 2000e-5(f)(1)
 
 
 [10]
 See Traynor, Reasoning in a Circle of Law, 56 Va.L.Rev. 739, 749-50 (1970)
 
 
 [11]
 Equal Employment Opportunity Act of 1972, Pub.L.No.92-261, 86 Stat. 103
 
 
 [12]
 Id. §§ 2(1), 11, codified at 42 U.S.C. §§ 2000e(a), 2000e-16
 
 
 [13]
 Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), the decision that recognized the disparate impact test, is discussed with approval in the legislative history of the 1972 Act. See H.R.Rep.No.238, 92d Cong., 1st Sess. --- (1971), reprinted in (1972) U.S.Code Cong. & Ad.News 2137, 2144
 
 
 [14]
 Jones, An Invitation to Jurisprudence, 74 Colum.L.Rev. 1023, 1030 (1974)
 
 
 [1]
 The majority, asserting that the language of section 1981 is "far less susceptible of an interpretation permitting an impact standard than is the language of title VII" (p. 986), highlights the difference between title VII's "adversely affect language and that of section 1981. This language distinction is not as strong as it might seem. Section 703(a)(1) makes it an unlawful employment practice for an employer "to discriminate ... because of" an employee's race, sex, religion, color or national origin. 42 U.S.C. § 2000e-2(a)(1). Although it is true that the development of the disparate impact test had its beginning in the " adversely affect" language of section 703(a)(2), the disparate impact standard has not been confined to that statutory language. Cases under section 703(a)(1) as well as section 703(a)(2) have applied the disparate impact test. See General Electric Co. v. Gilbert, 429 U.S. 125, 153-55 & n.6, 97 S.Ct. 401, 416-17, 50 L.Ed.2d 343 (Brennan, J., dissenting)
 
 
 [2]
 1 Stat. 53 (1789)
 
 
 [3]
 Joint Resolution of December 4, 1865, Cong.Globe, 39th Cong., 1st Sess. 6 (1865); Joint Resolution of December 12, 1865, Cong.Globe, 39th Cong., 1st Sess. 30 (1865)
 
 
 [4]
 Act of April 9, 1866, C. 31, 14 Stat. 27 (1866)
 
 
 [5]
 One of the specific changes Congress hoped to achieve as a result of the 1866 Civil Rights Act was elimination of the infamous Black Codes. Congress was primarily concerned with portions of these state laws relating to vagrancy and regulation of terms and conditions of employment. Among other things, many of these Black Codes made it a crime for a contract laborer to abandon, refuse to perform or to disobey his employer, provided for forfeiture of wages if the employee did not fulfill the terms of his contract, and made it a crime to induce an employee away from his employer. In some states, these oppressive regulations literally applied to all laborers regardless of race. Various state vagrancy laws defined vagrant broadly to include virtually all unemployed Black adults, and punished convicted vagrants by providing that they could be bound out for periods of up to a year. Several vagrancy statutes contained no reference to race, and in some states applied literally to whites as well as Blacks. See, e. g., E. McPherson, Political History of the United States During the Period of Reconstruction 30-44 (1871). These Black Codes were frequently discussed during the debates on the 1866 Civil Rights Act, and Congress clearly understood that passage of the Act would abrogate the Codes. E. g., Cong.Globe, 39th Cong., 1st Sess. 39-41, 118-25, 1151-60, 1838-39 (1866)
 
 
 [6]
 Senate Executive Document No. 2 (Dec. 19, 1865), 39th Cong. 1st Sess., reprinted in Virginia Commission on Constitutional Government. The Reconstruction Amendments' Debates 87 (1967)
 
 
 [7]
 Id. at 88
 
 
 [8]
 Id. at 92
 
 
 [9]
 Act of April 9, 1866, C. 31 § 1, 14 Stat. 27
 
 
 [10]
 Cong.Globe, 39th Cong., 1st Sess. 474 (1866)
 
 
 [11]
 Cong.Globe, 39th Cong., 1st Sess. 1366-67 (1866)
 
 
 [12]
 Cong.Globe, 39th Cong., 1st Sess. 1413-16 (1866)
 
 
 [13]
 It has been unsuccessfully argued that the intention of the House was to limit the Civil Rights Bill to cases involving state action. That view was tacitly, and I think correctly, rejected in Jones v. Alfred H. Mayer Co., 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968), which involved 42 U.S.C. § 1982. Section 1982, like section 1981, is derived from section 1 of the Civil Rights Act of 1866. In Young v. International Telephone & Telegraph Co., 438 F.2d 757 (3d Cir. 1971), this court held that section 1981 applies to actions by private employers. Compare, however, C. Fairman, Reconstruction and Reunion 1864-88, Part One, VI History of the Supreme Court of the United States 366 et seq. (1971). Since for our purposes the application of section 1981 to private actions is settled by Jones v. Alfred H. Mayer Co. and Young v. International Telephone & Telegraph Co., there is no reason for burdening this opinion with the reasons why I believe Professor Fairman's historical argument against Jones v. Alfred H. Mayer Co. is unpersuasive
 
 
 [14]
 Senator Cowan of Pennsylvania, a Republican, was in the opposition, and his racist expressions often matched those of the most outspoken Democrat, Senator Willard Saulsbury of Delaware
 
 
 [15]
 Act of April 9, 1866, C. 31, § 2, 14 Stat. 27
 
 
 [16]
 See Act of September 18, 1850, C. 60, 9 Stat. 462. Compare Act of April 9, 1866, C. 31, §§ 3-6, 14 Stat. 27
 
 
 [17]
 As the majority concedes, 42 U.S.C. § 1981 is the direct lineal descendant of Section 1 of the 1866 Act. The descent of the criminal sanction is set out in an appendix to Justice Frankfurter's opinion in United States v. Williams, 341 U.S. 70, 83 (1951)
 
 
 [18]
 Act of Sept. 29, 1789, as amended, 1 Stat. 93
 
 
 [19]
 Act of Sept. 24, 1789, 1 Stat. 73
 
 
 [20]
 The most egregious example is The Civil Rights Cases, 109 U.S. 3, 3 S.Ct. 18, 27 L.Ed. 835 (1883)
 
 
 [21]
 Chief Judge Seitz did not participate in National Association for the Advancement of Colored People v. The Medical Center, Inc
 
 
 [22]
 Many of us mark Chief Judge Seitz' opinion in Belton v. Gebhart, 32 Del.Ch. 343, 87 A.2d 862 (1952), aff'd sub nom. Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) as the beginning of the second reconstruction